IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **MEGAN WINSTON, et al.,** | : | **Case No. 2:10-CV-1005** |
| | : | |
| **Plaintiffs,** | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **FRANKLIN COUNTY, et al.,** | : | |
| | : | **Magistrate Judge Norah McCann King** |
| | : | |
| **Defendants.** | : | |

<u>**OPINION AND ORDER**</u>

**I. INTRODUCTION**

This matter is before the Court on the Motion for Summary Judgment of Defendants Herb Henderson, Lisa Marsh, Judge Dana Preisse, Karen Casey, Kevin O'Neil, Jodi Kidder, Gregory Lowe, Anthony LaBauve, and Mitchell Milner (collectively the "County Defendants"), (Doc. 95), and Motion for Summary Judgment of Defendant Brodotta Montgomery ("Montgomery"), (Doc. 98).  For the reasons set forth herein, the County Defendants' Motion is **GRANTED** in part and **DENIED** in part, and Defendant Montgomery's Motion is **DENIED.**

**II. BACKGROUND**

**A. Factual Background**

Plaintiffs Megan Winston and Derrek Winston (collectively "Plaintiffs") bring this action for compensatory and punitive damages for physical and emotional injuries allegedly sustained by Derrek Winston ("Winston") while detained at the Franklin County Juvenile Detention Center (the "JDC") in November 2008.  Winston, then fourteen years of age, was in JDC custody from June 8, 2008 until December 12, 2008, in connection with aggravated robbery charges that were subsequently dismissed.  *Winston Depo.*, Doc. 92, 9:16-24.

JDC employs an incentive-based system referred to as the "Level System," which allows youth in JDC custody to obtain privileges for good behavior and obeying JDC rules. The levels range from zero at orientation to a maximum of four. The Level System is implemented by JDC staff, including Juvenile Detention Officers ("JDOs"). While youth are typically placed in their rooms for bed at 8:30 p.m., level 3 and 4 youth have a bedtime of 9:30 p.m. Thus, after JDOs distribute snacks at 8:30 p.m., these level 3 and 4 youth are allowed back out of their rooms and given one hour of free time. The parties dispute whether level 1 and 2 youth are permitted out of their rooms after 8:30 p.m. without the permission of a unit supervisor. Winston was at level 4 on the Level System at all times relevant to this action. *JDC Standard Operating Procedures*, Doc. 107, Ex. D; *Youth Level System Memorandum*, Doc. 107, Ex. E; *Marshall Depo.*, Doc. 93, 23:24-24:12.

While at the JDC, Winston was housed in Unit 1, Pod B with Defendant Ricqus Marshall ("Marshall"). *Winston Depo.*, Doc. 92, 10:16-24. Marshall, then fifteen years old, entered into JDC custody on October 28, 2008 in connection with a drug possession charge. *O'Neil Depo.*, Doc. 90, 21:18-19; *Marshall Admission Sheet*, Doc. 110, Ex. 1. On October 29, 2008, the Juvenile Court Magistrate issued an order granting "temporary custody" of Marshall to Franklin County Children Services ("FCCS") and ordered that he be held in detention at JDC pending further hearing. *Magistrate's Order*, Doc. 98, Ex. B. Defendant Brodotta Montgomery ("Montgomery") is Marshall's biological mother and was his legal guardian at all times relevant to this action. *Montgomery Aff.*, Doc. 98 Ex. A.

On November 2, 2008, Marshall was involved in a fight with another youth, Kenneth Mitchell ("Mitchell"). The incident report indicates that the two were "talking trash to each other" when "Marshall hit Mitchell in the face and both youth started to fight." *Incident Report*,

Doc. 110, Ex. B.  Defendant Anthony LaBauve, a JDO on duty that night, fell to the ground in attempting to intervene in the fight. *Id*. Marshall was charged with and found guilty of a Rule 2(b) offense for fighting, which is considered a major rule violation.  Marshall was ordered to attend anger management classes and serve three days of solitary confinement beginning on November 12, 2008.  *Id*.; *Henderson Depo*., Doc. 87, 51:2-11, 53:3-12, 57:5-9.  The parties dispute what LaBauve knew about how the fight began, or the charges brought against Marshall in its wake.

On the evening of November 10, 2008, before Marshall was placed in solitary confinement, JDO LaBauve allowed Marshall and Winston out of their respective rooms to clean the Unit 1, Pod B common area at approximately 8:30 p.m.  Winston was entitled to be out of his room past 8:30 p.m. per his level privileges.  Marshall was a level 1 on the Level System, and the parties dispute whether JDC policies permitted LaBauve to allow Marshall out of his room at this time without permission from a supervisor.  The evidence adduced indicates that there was no previous hostility between Marshall and Winston.

A few days prior, Marshall and Winston had arranged a trade wherein Winston would draw a picture in exchange for Marshall's bedtime snack.  LaBauve acknowledges that the exchange of food is against JDC rules because of "safety considerations," including avoiding situations in which youth bully or become indebted to one another.  *LaBauve Depo*., Doc. 88, 38:3-11. Plaintiffs have presented evidence which suggests LaBauve was aware that Winston often received snacks in exchange for drawings and, on a number of occasions, delivered the extra snacks to Winston himself. *Winston Depo*., Doc. 92, 12:2-14:12.  Marshall testified at his deposition that, on the evening of November 10, as he was exiting his room to clean, Marshall asked LaBauve whether he had to give his snack to Winston in exchange for the picture he had

received.  *Marshall Depo.*, Doc. 93, 44:4-20.  LaBauve apparently responded that he did not. *Id.; see also Institutional Disciplinary Hearing Report*, Doc. 110, Ex. F at 11.  Winston was upset that that Marshall would not give up his snack and had told on him to LaBauve.  *Marshall Depo.*, Doc. 93, 44:4-20. The two immediately began "bickering." *LaBauve Depo.*, Doc. 88, 26:23-27:20 (Q: So from 8:30 as soon as you let them out, they started bickering.  Is that your testimony?  A: Yes.).

Plaintiffs contend that Winston and Marshall continued to interact – and apparently "talk trash" – over the course of 22 minutes, while cleaning the common room. Defendants dispute whether this trash-talking was continuous.  During this time, LaBauve told Winston and Marshall once to be quiet, and appears to have been on the phone.  *Marshall Depo.*, Doc. 93, 37:2-38:24; *LaBauve Depo.*, Doc. 88, 26:23-27:20.  What LaBauve overheard of Marshall and Winston "bickering" is disputed, as is whether LaBauve ordered either youth to go to his room at any point during their disagreement. *Compare LaBauve Depo.*, Doc. 88, 27:5-7, *with Marshall Depo.*, Doc. 93, at 63:20-24. LaBauve acknowledges that JDOs are trained "to look out for potential threatening behavior and if that was to arise to separate [the youth] and call for assistance." *LaBauve Depo.*, Doc. 88, at 13:17-22.

Marshall testified at his deposition that Winston "copped a little attitude" and – at 8:51:17 p.m., according to security footage of that night – approached Marshall with his pants "up," a gesture the JDC youth consider threatening. *Marshall Depo.*, Doc. 93, 37:2-40-23; *Security Footage*, Doc. 110, Ex. G.  At 8:52:11 p.m. on November 10, 2008, Winston bumped Marshall as he was crossing the room. *Security Footage*, Doc. 110, Ex. G.  Security footage shows that Marshall turned swiftly and punched Winston in the face. Winston immediately falls out of the frame.  It is unclear whether Winston hit his head on the floor or a near-by table.  The cameras

4

pan to show Winston lying on the floor, apparently unconscious, his head surrounded by a growing pool of blood.  *Id.*  LaBauve issued a radio call to ask for assistance and sent Marshall to his room.  Other JDOs and supervisors responded to the scene and rendered aid to Winston.

Winston was taken to the hospital and remembers waking up sometime thereafter. *Winston Depo.*, Doc. 92, 23:8-24:4.  He was diagnosed with a traumatic brain injury, occipital lobe skull fracture, a laceration requiring four stitches, and now allegedly suffers from seizures, memory loss, depression, impulsive behavior control, mood disorders and migraines.  *Id.* at 34:21-35:13, 40:12-16; *Walters Email*, Doc. 110, Ex. F at 49.  Marshall asserted that he did not intend to cause Winston any serious harm, but pled guilty to assault in violation of JDC Rule 10, for which he served three days in solitary confinement.  *Institutional Disciplinary Hearing Report*, Doc. 110, Ex. F at 11.  Marshall was also criminally charged with second degree felonious assault, resulting in a nine-month detention in an Ohio Department of Youth Services facility.  *Marsh Depo.*, Doc. 89, 66:18-22; *Marshall Depo.*, Doc. 93, 12:16-20; 16:10-18.

### B. Procedural Background

Plaintiffs Derrek Winston and his mother, Megan Winston, filed suit on November 9, 2010, alleging that, as a result of the November 10, 2008 incident, Derrek Winston suffered injury to his brain, head and neck, medical expenses, lost wages, significant behavior changes, cognitive dysfunctions, memory loss and seizures.  (Doc. 2.)  Plaintiffs' initial complaint identified the following Defendants:  (1) The County of Franklin, Ohio ("Franklin County"); (2) the Franklin County, Ohio Board of Commissioners (the "Board"); (3) Herb Henderson ("Henderson"), Superintendent for Franklin County Juvenile Detention Center (in his individual and official capacities); (4) Marshall; (5) Montgomery, the parent and legal guardian of Marshall; (6) "John Does No. 1 through 10," Juvenile Detention Officers ("JDOs") of the

Franklin County Juvenile Detention Center (in their individual and official capacities). Plaintiffs asserted state law claims against Marshall for assault, battery, and intentional infliction of emotional distress and against Montgomery for parental liability pursuant to O.R.C. § 3109.10. With respect to Franklin County, the Board, Henderson and the JDOs, Plaintiffs alleged that these Defendants were deliberately indifferent, in violation of Winston's civil rights pursuant to 42 U.S.C. §§ 1983 and 1988 and the Fourteenth Amendment, because they disregarded a known and excessive risk to Winston's health and safety. Plaintiffs also brought claims against these County-related Defendants for state law negligence and Megan Winston's loss of consortium.

On June 30, 2011, this Court granted a Fed. R. Civ. P. 12(b)(6) motion to dismiss by Defendants Franklin County and the Board for failure to state a claim. (Doc. 21.) In dismissing claims against the Board, this Court found that the Board "was under no duty to provide a safe detention space in the Franklin county Juvenile Detention Center because the Board lacks the statutory authority to create policies related to the safety and protection of detainees." (*Id*. at 5.) Rather, the Court found that "employees of detention facilities are under the direct authority of the juvenile court, and must abide by the guidelines and requirements for juvenile detention centers mandated by the Ohio Department of Youth Services" pursuant to O.R.C. § 5139.281. (*Id*. at 6.)

On August 2, 2011, Plaintiffs filed their First Amended Complaint. (Doc. 25.) The amended complaint maintained the same state claims against Marshall and Montgomery, and asserted deliberate indifference, negligence and loss of consortium claims against the following Defendants: (1) Henderson (in his individual and official capacities); (2) Lisa Marsh ("Marsh"), Assistant Superintendent for Franklin County Juvenile Detention Center (in her individual and official capacities); (3) Judge Dana S. Preisse ("Preisse"), Administrative Judge, Franklin County

Common Pleas Domestic Relations and Juvenile Branch (in her official capacity); (4) Karen S.
Casey ("Casey"), Court Director, Franklin County Court of Common Pleas Domestic Relations
and Juvenile Branch (in her official capacity); (5) Kevin O'Neil ("O'Neil"), Shift Supervisor,
Franklin County Juvenile Detention Center (in his individual and official capacities); (6) Jodi
Kidder ("Kidder"), Shift Supervisor (in her individual and official capacities); (7) Gregory Lowe
("Lowe"), Shift Supervisor (in his individual and official capacities); (8) Anthony LaBauve
("LaBauve"), JDO (in his individual and official capacities); (9) Devon Payne ("Payne"), JDO
(in his individual and official capacities); (10) Darryl Hawkins ("Hawkins"), JDO (in his
individual and official capacities); (11) Joseph Murchison ("Murchison"), JDO (in his individual
and official capacities); (12) Amy Kelly ("Kelly"), JDO (in her individual and official
capacities); (13) Mitchell Milner ("Milner"), JDO (in his individual and official capacities); (14)
John Does No. 1 through 4, JDOs/Shift Supervisors (in their individual and official capacities).

On July 2, 2012, Defendants Henderson, Marsh, Preisse, Casey, O'Neil, Kidder, Lowe,
LaBauve, and Milner (collectively the "County Defendants") moved for summary judgment.
(Doc. 95.) Plaintiffs subsequently agreed to dismiss all claims against Defendants Kelly, Payne,
Hawkins, Murchison and Milner. (Doc. 103.) In the course of briefing their opposition to the
County Defendants' motion, Plaintiffs also voluntarily dismissed all claims against Defendants
O'Neil, Kidder, and Lowe, as well as all claims against Defendants Henderson and Marsh in
their individual capacities. (Doc. 114.) LaBauve is the sole remaining County Defendant sued in
both his official and individual capacities. Henderson, Marsh, Preisse, Casey remain as
Defendants in their official capacities only.

The remaining County Defendants seek summary judgment on Plaintiffs' federal claims
against them, variously asserting: Eleventh Amendment immunity, qualified immunity, and the

absence of an established policy or practice giving rise to the alleged constitutional deprivations. (Doc. 95.)  They seek summary judgment on Plaintiffs' state law claims on the basis of state statutory immunity pursuant to O.R.C. § 2744.02(A)(1). (*Id.*)

On July 5, 2012, Defendant Montgomery moved for summary judgment on the O.R.C. § 3109.10 parental liability claim against her. (Doc. 98.)  Montgomery argues both that Marshall's action was not "willful and malicious" (as is required to trigger parental liability), and that she was not a "parent" under the meaning of the statute at the time of the alleged assault.

Both the County Defendants' and Montgomery's motions for summary judgment have been fully briefed, and were the subject of oral argument on January 30, 2013.  These matters are now ripe for review.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir. 1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

In determining whether summary judgment is appropriate, the necessary inquiry is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson,* 477 U.S. at 251-52). Summary judgment "will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a

reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. To survive such a motion, however, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339-40 (6th Cir. 1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a movant's motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir. 1986)). In assessing whether summary judgment is proper, the Court views evidence in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).

### IV. LAW AND ANALYSIS

#### A. The County Defendants

<u>1. Eleventh Amendment Immunity</u>

Invoking Eleventh Amendment immunity, the remaining County Defendants move to dismiss the claims brought against them in their official capacities for want of jurisdiction. "[S]tate governments, and their arms, officers, and instrumentalities are generally immune from a private lawsuit in federal court by virtue of the Eleventh Amendment to the United States Constitution." *Mumford v. Basinski*, 105 F.3d 264, 267 (6th Cir. 1997). The "bar of the Eleventh Amendment to suit in Federal courts …. does not extend to counties and similar municipal corporations." *Alkire v. Irving*, 330 F.3d 802, 811 (6th Cir. 2003) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977)). Thus, the question here is whether the Franklin County Juvenile Detention Center – the governmental entity represented by the individual County Defendants – "should be considered an 'arm of the state' and thus vested with

9

sovereign immunity." *Id.* (explaining that individuals "sued in their official capacity stand in the shoes of the entity they represent").

As this Court noted in its June 30, 2011 Order, Ohio statute places juvenile detention facilities "under the direct authority of the juvenile court." (Doc. 21 at 6.) The Sixth Circuit decided in *Mumford v. Basinski* that Ohio courts of common pleas are arms of the state for the purposes of the Eleventh Amendment. 105 F.3d at 268. Accordingly, citing *Mumford*, the Sixth Circuit held in *Oswald v. Lucas County Juvenile Detention Center* that, as part of the juvenile court, "a county juvenile detention center … is an arm of the state" also protected by sovereign immunity. 234 F.3d 1269, at *2 (Table) (6th Cir. 2000) (decided under O.R.C. § 2151.34, recodified as O.R.C. § 2152.41).

Plaintiffs argue that *Mumford*, and by extension *Oswald*, are no longer good law. *Mumford* relied on the fact that Ohio courts of common pleas were creatures of state law, created by a statutory grant of jurisdiction, supervised by the Ohio Supreme Court, and subject to the judicial standards of the Ohio Constitution. In light of subsequent Supreme Court precedent, the Sixth Circuit has explained that "the reasoning in *Mumford*, if not the result, is now incorrect," because it "nowhere addressed the issue of who would pay for a damage judgment against the court of common pleas." *Alkire*, 330 F.3d at 811-12 (citing *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425 (1997)).[1]

Significantly, however, "whatever reservations the Sixth Circuit may have with regard to applying the traditional factors to a determination of state sovereignty, … it has not overruled *Mumford* or *Oswald*" as to their specific holdings regarding Ohio courts of common pleas and

---

[1] The Sixth Circuit in *S.J. v. Hamilton County* expressed a new four-factor test for determining whether an entity is an arm of the state: "(1) whether the state would be responsible for a judgment against the entity in question; (2) how state law defines the entity; (3) what degree of control the state maintains over the entity; and (4) the source of the entity's funding." 374 F.3d 416, 420 (6th Cir. 2004).

juvenile detention facilities. *Connor v. Catalano*, No. 1:10-CV-1860, 2010 WL 4316752, at *2 (N.D. Ohio Oct. 26, 2010) (citing *Tripplett v. Connor*, 109 Fed. Appx. 94, 96 n.4 (6th Cir. 2004) ("[W]e have expressed … some doubt about the continued validity of *Mumford*'s reasoning [regarding Eleventh Amendment immunity for Ohio courts of common pleas]. We have not, however, decided that *Mumford* was incorrect… and we decline to overrule *Mumford* in the absence of [proper] briefing.")). *See also S.J. v. Hamilton Cnty., Ohio,* 374 F.3d 416, 422-23 (6th Cir. 2004) (holding that a juvenile *training* facility is not an arm of the state, but explicitly distinguishing *Oswald* because the authorizing statute for *training* facilities – O.R.C. § 2151.65 – vests counties with discretion not present in O.R.C. § 2152.41, the authorizing statute for juvenile *detention* facilities). Thus, "[t]he current state of law, as set forth by the binding precedent of the Sixth Circuit opinions in *Mumford*, *Triplett*, and *Oswald*, unequivocally states that a juvenile detention facility is 'part of the juvenile court, which is an arm of the state'" for the purposes of Eleventh Amendment immunity. *Connor*, 2010 WL 4316752, at *2 (quoting *Oswald*, 234 F.3d 1269, at *2).

Because state instrumentalities are immune from civil damages suits in federal court, Defendants Henderson, Marsh, Preisse, Casey and LaBauve, in their official capacities, are likewise immune. As such, there is no need to consider the County Defendants' other arguments for summary judgment on claims asserted against them in their official capacities. Plaintiffs' claims against the County Defendants in their official capacities are **DISMISSED** for want of jurisdiction.

## 2. Qualified Immunity

Plaintiffs' amended complaint asserts claims against Defendant LaBauve in his individual capacity for deliberate indifference to Winston's health and wellbeing in violation of 42 U.S.C.

11

§§ 1983 and 1988 and the Fourth Amendment (Count I).  Generally, in civil damages actions arising out of government officials' performance of discretionary functions, officials are entitled to qualified immunity from suit "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Philips v. Roane Cnty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).

To evaluate whether qualified immunity applies, the Sixth Circuit employs a two-step analysis that considers:  "(1) whether, considering the allegation in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Hill v. Kentucky*, 457 F.3d 583, 587 (6th Cir. 2006) (quoting *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005)). The order of this inquiry is not mandatory, nor does a court need to reach both steps of the analysis. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).   In addition, courts in this Circuit occasionally perform a third inquiry into "whether the plaintiff offered sufficient evidence to indicate what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."  *Hill*, 457 F.3d at 587 (alterations in original) (quoting *Champion v. Outlook Nashville, Inc*., 380 F.3d 893, 901 (6th Cir. 2004)).   In order to avoid duplicative analysis, this third step can be collapsed into the second if "the case at issue 'is one of the many cases where, if the right is clearly established, the conduct at issue would also be objectively unreasonable.'" *Id*. (quoting *Caudill v. Hollan*, 431 F.3d 900, 911 n.10 (6th Cir. 2005)).

Significantly, when evaluating qualified immunity at the summary judgment stage, courts usually "adopt[] … the plaintiff's version of the facts,' unless the plaintiff's version is 'blatantly contradicted by the record so that no reasonable jury could believe it….'" *Stoudemire v. Mich.*

*Dep't of Corrections*, No. 11-1588, -- F.3d --, at *4 (6th Cir. Jan. 31, 2013) (internal citations omitted) (quoting *Scott v. Harris*, U.S. 372, 378 (2007)).

### a. Clearly Established Rights and Objective Unreasonableness

In deciding a motion for summary judgment, courts may determine whether or not a right was clearly established at the time of the alleged violation.  *Harlow*, 457 U.S. at 818.  Whether the right was "clearly established" is determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz,* 533 U.S. 194, 201 (2001).  Moreover, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Ceighton,* 483 U.S. 635, 640 (1987). Notably, "[t]his does not mean that 'an official action is protected by qualified immunity unless the very action in question has previously been held unlawful.' Rather, it means that 'in light of pre-existing law the unlawfulness must be apparent.'" *Stoudemire*, -- F.3d --, at *8 (internal citations omitted) (quoting *Anderson*, 483 U.S. at 640).

Here, Plaintiffs allege that LaBauve violated Winston's Fourteenth Amendment due process rights as a detainee by acting with deliberate indifference to his health and wellbeing. The Supreme Court has held definitively that "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, the Sixth Circuit has held that when prison officials act with deliberate indifference to such prisoner violence, they violate pre-trial detainees' clearly established rights under the Fourteenth Amendment.  *Leary v. Livingston Cnty.*, 528 F.3d 438, 442 (6th Cir. 2008).  *See also Doe v. Bowles*, 254 F.3d 617, 620 (6th Cir. 2001) ("The right of an inmate to be protected from an attack by a fellow inmate was well established at the time the events in question took place."). Therefore, where a plaintiff establishes that a deliberate indifference violation occurred, "[i]t

would have been 'clear to a reasonable officer that [such] conduct was unlawful.'" *Leary*, 528 F.3d at 442 (quoting *Saucier*, 533 U.S. at 202).

### b. Whether LaBauve Acted With Deliberate Indifference

The question on summary judgment, then, is whether there exists a dispute of material fact as to whether LaBauve acted with deliberate indifference in violation of Winston's Fourteenth Amendment rights.  While "deliberate indifference entails something more than mere negligence, … it is [also] satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.  Thus, "[t]o raise a cognizable deliberate-indifference claim, an inmate must show that the alleged mistreatment was 'objectively' serious and that the defendant 'subjectively' ignored the risk to the inmate's safety." *Leary*, 528 F.3d at 442 (citing *Farmer*, 511 U.S. at 829).

### i. Objective Component

The objective component of the deliberate indifference test asks whether "the conditions facing [Winston] pose[d] an objectively 'substantial risk of serious harm.'" *Id*. at 441 (quoting *Farmer*, 511 U.S. at 834). Here, there is no dispute as to whether Marshall punched Winston, and no dispute as to whether it was the cause of his injury.  The parties do dispute whether the conditions in which Winston was held posed a *substantial risk* of serious injury. LaBauve cannot plausibly assert that there was no risk, given the evidence indicating that Winston was seriously harmed. He argues, however, that "there is no evidence before the court that indicates that hostilities between Derrek [Winston] and Ricqus [Marshall] were likely" because there was no history of such hostility. (Doc. 115 at 5.)  Plaintiffs counter that Marshall's history and the circumstances of Marshall and Winston's 22-minute interaction on November 10, 2008 created an objectively serious risk.

Plaintiffs have produced evidence that, on November 2, 2008, just the week prior to the incident with Winston, Marshall punched another youth in the face, escalating trash-talking into a physical altercation. *Incident Report*, Doc. 110, Ex. B.  LaBauve himself fell to the ground while attempting to intervene in the fight.  Marshall was charged with a Rule 2(b) offence for fighting – a major rule violation – and ordered to attend anger management classes and serve three days of solitary confinement beginning on November 12, 2008.  *Henderson Depo.*, Doc. 87, 51:2-11, 53:3-12, 57:5-9.

On the evening of November 10, 2008, before Marshall was placed in solitary confinement, LaBauve allowed Marshall out of his room to clean without first notifying a supervisor.  Plaintiffs have presented evidence that Marshall and Winston had arranged a trade, wherein Winston would draw a picture in exchange for Marshall's snack, and the two began to talk trash when Marshall refused to give Winston the snack. *Marshall Depo.*, Doc. 93, 44:4-20; *LaBauve Depo*, Doc 88, 26:23-27:20; 33:1-23.  LaBauve acknowledges that the exchange of food is against JDC rules because it has the potential to expose youth to harm at the hands of other youth.  *LaBauve Depo.*, Doc. 88, 38:6-11.  LaBauve also states that he was trained "to look out of potential threatening behavior and if that was to arise to separate [the youth] and call for assistance."  *Id*. at 13:17-22.  Though LaBauve states that he did order Marshal and Winston to be quiet, and eventually, to go to their rooms, Plaintiffs present evidence to show that LaBauve took no action to separate the two.  *Marshall Depo.*, Doc. 93, at 63:20-24. Plaintiffs have also presented evidence that Winston and Marshall continued to interact and talk trash for a total of 22 minutes, culminating in the alleged assault at 8:52 p.m.  *See LaBauve Depo*, Doc 88, 26:23-27:20.

The above facts, when taken together and viewed in the light most favorable to Plaintiffs, could lead a reasonable jury to conclude that LaBauve's failure to intervene objectively created a substantial risk of serious harm. *Cf. Leary*, 528 F.3d at 442 (holding, even in the absence of prior specific threats against a detainee, that evidence of prison norms of violence against prisoners charged with child rape established "that inmates' knowledge of such charges posed of an objectively serious risk of harm").

ii. Subjective Component

The deliberate indifference standard's subjective component "requires a plaintiff to demonstrate that 'the official being sued perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he disregarded that risk.'" *Parsons v. Caruso*, 2012 WL 3186662, at *4 (6th Cir. Aug. 7, 2012) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)).  Although "[i]t is not enough to show that an official 'fail[ed] to alleviate a significant risk that he should have perceived but did not,'" *id*. (quoting *Farmer*, 511 U.S. at 838), "[s]ubjective knowledge of a substantial risk can be 'demonstrate[d] … from circumstantial evidence.'"  *Id*. at *5 (quoting *Farmer*, 511 U.S. at 842). Moreover, "[i]f the risk is obvious, so that a reasonable man would realize it, we might well infer that the defendant did in fact realize it." *Id*. (quoting *Farmer*, 511 U.S. at 842).  While "it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety," this determination would fall to the trier of fact. *Id*.

Defendant argues that, because there was no prior hostility between Marshall and Winston, and Winston himself previously though he and Marshall were "fine," it would be "unreasonable to expect clairvoyance from JDO LaBauve."  (Doc. 95 at 11.)  Defendant is correct that, alone, Marshall's prior involvement in a fight with another youth would be

16

insufficient to put LaBauve on notice that Winston was at risk: "the mere fact that a prison official is aware of one assault is not enough to show that the official was actually aware of a risk of a second assault." *King v. Edward Banks*, No. 2:10-cv-852, 2012 WL 2891264, at *4 (S.D. Ohio Jul. 13, 2012).  That is not, however, the only information that was available to LaBauve at the time of the alleged assault. Plaintiffs have presented evidence – albeit some of it disputed – that LaBauve was also knew: (1) Marshall had a history of escalating trash-talk to violence by punching other youth in the face; (2) JDC rules against exchanging food were intended to protect youth from potential harm; (3) Marshall and Winston had arranged an illicit food trade; (4) Winston was angry that Marshall did not want to comply with the bargain; (5) Winston and Marshall were talking trash from the time they were released from their rooms at 8:30 p.m.; (6) Marshall and Winston ignored instructions to be quiet; and (7) JDOs are trained to separate youth exhibiting potentially threatening behavior.  Thus, even if Defendant is correct that there was no reason to expect hostilities when Marshall and Winston were first placed on cleaning duty at 8:30 p.m., a reasonable jury could infer that LaBauve, as a reasonable man aware of these facts, would have realized the risk by the time trash-talk escalated to violence at 8:52 p.m.

Given the genuine disputes of material fact as to whether there was an objective risk of substantial harm, as well as whether LaBauve was subjectively aware of that risk and disregarded it, summary judgment will not lie.  *Anderson*, 477 U.S. at 248.  Defendant LaBauve's motion for summary judgment on Count I as asserted against him in his individual capacity is therefore **DENIED**.

### 3. State Law Claims

Plaintiffs also assert state law claims against Defendant LaBauve in his individual capacity for negligence (Count II) and Megan Winston's loss of consortium (Count VII).

Defendant moves for summary judgment on these claims on the basis of state law statutory immunity. Ohio Revised Code § 2744.03(A)(6) provides that that employees of a political subdivision are immune from civil liability for damages allegedly caused by acts or omissions in connection with a governmental or proprietary function, unless:

> (a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

> (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner;

> (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code. Civil liability shall not be construed to exist under another section of the Revised Code merely because that section imposes a responsibility or mandatory duty upon an employee, because that section provides for a criminal penalty, because of a general authorization in that section that an employee may sue and be sued, or because the section uses the term "shall" in a provision pertaining to an employee.

Here, Plaintiffs argue that the second statutory exception – for acts or omissions "with malicious purpose, in bad faith, or in a wanton or reckless manner" – applies. In the context of the immunity statute, Ohio courts have defined "reckless conduct" as "an act done with knowledge or reasons to know of facts that would lead a reasonable person to believe that the conduct creates an unnecessary risk of physical harm that is greater than necessary to make the conduct negligent." *Culberson v. Doan*, 125 F.Supp.2d 252, 284 (S.D. Ohio 2000) (quoting *Caruso v. State*, 737 N.E.2d 563, 567-568 (Ohio 2000)). The term "reckless" is often used interchangeably with the word "wanton." *Id*. (quoting *Caruso*, 737 N.E.2d at 568). While no intent to cause injury is required for either term, they both "connote a mental state of greater culpability than simple carelessness or negligence." *Id*. (quoting *Caruso*, 737 N.E.2d at 568).

The parties' respective arguments here are largely similar to those asserted for and against the application of qualified immunity. Defendants assert that there is no evidence to

18

suggest that LaBauve knew or had reason to know that Winston was at risk on November 10, 2008.  As explained above, however, when viewed in the light most favorable to Plaintiffs, the evidence concerning Marshall's history, the circumstances in the 22 minutes leading up to the alleged assault, and LaBauve's knowledge of those facts, could lead a reasonable jury to conclude that he acted with deliberate indifference.  Given that deliberate difference imposes a higher standard than does recklessness, a reasonable jury could conclude on the same facts that LaBauve acted in "a wanton or reckless manner." Thus, Plaintiffs have alleged sufficient facts to create a genuine issue of material fact as to whether the character of Defendant LaBauve's acts or omissions fall within the scope of the § 2744.03(A)(6)(b) exception to employee immunity. Defendant LaBauve's motion for summary judgment on the state law claims against him on the basis of statutory immunity is therefore **DENIED**.

### B. Defendant Montgomery

Plaintiffs assert a claim against Defendant Montgomery for parental liability pursuant to O.R.C. § 3109.10 (Count VI).  The parental liability statute provides, in pertinent part:

> Any person is entitled to maintain an action to recover compensatory damages in a civil action, in an amount not to exceed ten thousand dollars and costs of suit in a court of competent jurisdiction, from the parent of a child under the age of eighteen if the child willfully and maliciously assaults the person by a means or force likely to produce great bodily harm.

O.R.C. § 3109.10.

Defendant Montgomery moves that this Court grant summary judgment against the Plaintiff on Count VI of the amended complaint.  Montgomery first argues that she was not a "parent" within the meaning of the statute at the time relevant to this action. She also argues that Marshall's alleged assault was not sufficient to trigger parental liability. The Court takes up each argument in turn.

### 1. Whether Montgomery is a "Parent" Under § 3109.10

Montgomery does not dispute that she is Marshall's biological mother, nor that he resided with her, and was in her care, custody and control until October 29, 2008. She asserts, however, that her legal status was changed by the October 29, 2008 Juvenile Court Order which granted "temporary custody" of Marshall to Franklin County Children Services ("FCCS") and ordered that he be held in detention at JDC pending further hearing. *Juvenile Court Magistrate's Order*, Doc. 98, Ex. 2. At the time of the November 10, 2008 incident, he was still in the custody of JDC. Because only FCCS and JDC could make decisions for and on behalf of Marshall during the period of his detention, Montgomery argues that she cannot be held responsible as a "parent" under O.R.C. § 3109.10.

The term "parent" for the purposes of O.R.C. § 3109.10 is defined in O.R.C. § 3109.09(A) to mean one of the following:

> (1) Both parents unless division (A)(2) or (3) of this section applies;

> (2) The parent designated the residential parent and legal custodian pursuant to an order issued under section 3109.04 of the Revised Code that is not a shared parenting order;

> (3) The custodial parent of a child born out of wedlock with respect to whom no custody order has been issued.

Thus, by the plain language of the statute, the biological parent is only exempt from parental liability if that parent is not the legal custodian pursuant to a § 3109.04 order, or is the noncustodial parent of a child born out of wedlock to whom no custody order has been issued. In the absence of other enumerated exceptions for temporary losses of legal custody, the canon of *expressio unius* dictates against reading in an exception for a child temporarily in the custody of the juvenile court system. *See Cogswell v. Brook*, No. 2003-G-2511, 2004 WL 2376271 (Ohio Ct. App. Oct. 22, 2004) (holding that neither a county children services board nor a foster parent

appointed and certified by a county children's services board can be held liable under O.R.C. § 3109.10 for the willful acts of a child temporarily in their custody).

Moreover, O.R.C. § 3109.10 imposes strict liability on parents for the willful acts of their minor children, regardless of whether the child was under the parent's supervision or control at the time of the tortious conduct. *Hunt v. Hicks*, 98-CA-72, 1999 WL 254473, at *2 (Ohio Ct. App. Mar. 17, 1999) (holding a residential parent liable under § 3109.10 for crimes committed by her child while in the temporary custody and control of his non-residential parent, even where the residential parent was not negligent in supervising her son). Whatever reservations this Court may have about imposing liability on a parent temporarily stripped of custody by the juvenile court, it must defer to the policy judgment exercised by the Ohio legislature in enacting the parental liability statute. Accordingly, by its terms, Defendant Montgomery is a parent within the meaning of O.R.C. § 3109.10, and, therefore, potentially subject to liability for damages arising from Marshall's willful acts.

### 2. Whether Marshall's Acts Trigger Parental Liability

Defendant Montgomery next argues that Marshall's alleged assault on Winston was not sufficient to trigger parental liability because it was not "willful and malicious." Specifically, Montgomery asserts that Marshall harbored no malice against Winston and was acting only in self-defense, out of fear for his safety. Montgomery also contends that a single punch would not ordinarily result in any serious harm, and therefore cannot be considered "a means or force likely to produce great bodily harm." Plaintiffs counter that Marshall did not need to throw a second punch because his first sent Winston to the ground, unconscious. Montgomery also points to evidence that Winston's injury was directly caused by his impact with the table – something she says Marshall could not have anticipated. Plaintiff disputes whether Winston's head hit the table

21

or the floor.  Regardless, Marshall's punch did hit Winston with enough force to cause an impact that resulted, Plaintiffs allege, in severe blood loss, brain injury, seizures, and cognitive and behavioral changes.

The Ohio Supreme Court has defined "willful misconduct" as conduct involving "an intent, purpose or design to injure."  *McKinney v. Hartz & Restle Realtors, Inc*., 8510 N.E.2d 386, 389 (Ohio 1987).  Furthermore, in Ohio, "[m]alice in the legal sense signifies a willful design to do another injury, and this is regardless of the fact that such design was prompted by hatred or revenge, or by hope of gain." *Bush v. Kelley's Inc*., 247 N.E.2d 745, 747 (Ohio 1969).  In the context of statutory parental liability, Ohio courts have permitted the necessary mental state to be inferred from the quality and character of the act itself.  *See Klein v. Compton*, No. 85AP-168, 185 WL 3884 at *1 (Ohio App. Nov. 19, 1985) (upholding a finding of parental liability where a minor child was part of a group who assaulted a plaintiff and there is evidence that the child directly punched and kicked the victim, without additional evidence that assault was malicious or intended to produce great bodily harm).

Here, the question of whether Marshall intended to injure Winston or whether "willful and malicious" intent can be inferred from the character of Marshall's alleged assault is one of material fact properly determined by a jury.  Defendant is unable to point to any authority which states that a finding of self-defense negates the requisite scienter to trigger parental liability as a matter of law.  Even so, whether Marshall's response was reasonable given the provocation and he acted in self-defense would be disputed questions of material fact.  Finally, it is for a jury to determine if a punch to the face with the force supplied by Marshall was likely to cause great bodily injury.  Because a reasonable jury could conclude that a punching someone in the face

with the force in question was a willful or malicious act likely to cause great bodily harm, summary judgment will not lie.

Defendant Montgomery's Motion for Summary Judgment on Count VI of Plaintiffs' amended complaint is therefore **DENIED**.

## V. CONCLUSION

For the reasons stated above, the County Defendants' Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part. Plaintiffs' claims against the County Defendants in their official capacities are hereby **DISMISSED**. Defendant Montgomery's Motion for Summary Judgment is **DENIED**.

**IT IS SO ORDERED.**

**s/ Algenon L. Marbley**
**Algenon L. Marbley**
**United States District Court Judge**

**DATED:  February 25, 2013**